STATE of Missouri, Respondent,

v.

Michael Lee BURCH, Appellant.

Michael Lee BURCH, Appellant,

v.

STATE of Missouri, Respondent.

Nos. 15233, 15982.

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 23, 1989.

Motion for Rehearing or Transfer to Supreme Court Denied Sept. 14, 1989.

Application to Transfer Denied Nov. 14, 1989.

Melinda K. Pendergraph, Columbia, Kimberly Bonney Landman, Asst. Public Defender, Springfield, for appellant.

William L. Webster, Atty. Gen., Elizabeth Levin Ziegler, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

A jury found Michael Lee Burch ("defendant") guilty of sodomy, § 566.060.3,[1] by having deviate sexual intercourse with R——, a five-year-old girl. The jury assessed punishment at seven years' imprisonment. On May 29, 1987, the trial court imposed that sentence. Defendant filed a timely notice of appeal (number 15233).

On June 13, 1988, while that appeal was pending, defendant commenced an action in the trial court under Rule 29.15[2] to vacate his conviction and sentence.[3] In accordance with Rule 29.15(1) appeal number 15233 was suspended pending determination of the post-conviction action.

On October 7, 1988, the trial court entered findings of fact, conclusions of law and an order denying relief in the post-conviction action without an evidentiary hearing. Defendant filed a timely notice of appeal (number 15982) from that order.

Pursuant to Rule 29.15(1) appeals 15233 and 15982 have been consolidated. We address the initial appeal first. In it, defendant complains that (1) the evidence was insufficient to support the conviction, and (2) the trial court committed plain error in allowing four witnesses—R——'s mother, a police officer, a deputy juvenile officer, and a social service worker of the Division of Family Services—to testify regarding R——'s extrajudicial statements about alleged acts of sodomy. The assignments of

---

1. References to statutes are to RSMo 1986.

2. Rule references are to Missouri Rules of Criminal Procedure (19th ed. 1988), except where otherwise indicated.

3. Rule 29.15(m) provides that if sentence is pronounced prior to January 1, 1988, and no prior motion has been filed pursuant to Rule 27.26 (repealed effective January 1, 1988), a motion under Rule 29.15 may be filed on or before June 30, 1988.

error require a comprehensive recital of the evidence.

R——'s mother, K——, testified that R——'s date of birth is December 13, 1980. On May 26, 1986, K——, R——, and K——'s other child, age five months, were residing in Springfield. K——'s husband was temporarily in Texas, having been gone some three months.

On the same street three houses distant, defendant resided with his sister, Linda,[4] and Linda's daughter, April. K—— testified that R—— and April were playmates, April being about R——'s age. R——, according to K——, referred to defendant as "Mike."

K—— recounted that on the evening of May 26, 1986, she and her two children returned home from a six-day trip to Texas. While K—— was unpacking, R—— was sitting "kind of Indian-style" on the floor watching television. K—— noticed R—— had her hand under her skirt rubbing or touching her underwear "[i]n her crotch." K—— told R—— that little girls don't "go around with their hands down there." K——'s testimony:

"Q What if anything did [R——] say to you?

A She looked me in the eye and said: but Linda and Mike do.... And she explained to me a little bit more. She said but Linda and Mike do. And April does. She had added that on a moment later.

Q Did you ask her to explain what it was that they do?

A Yes, I did.

Q What did you ask her?

A She said that they touched her down there."

K—— explained that R—— refers to her vaginal area as her "tee-tee." K——'s testimony continued:

"Q ... what if anything did [R——] tell you about her tee-tee?

A She said that it felt itchy, that it hurt.

Q What did she say about Linda and Michael in reference to her tee-tee? If anything.

A She said that they touched her there, with that look on her face like they do it, they touch her there.

. . . .

Q When [R——] told you what had happened, did she tell you where these things had happened? What did she say about where it had happened?

A She had told me that it had happened in a garage.

Q Did she indicate that it happened any other place?

A And she said that there was a time when something had happened between her and April in April's bathroom when she went in there to go to the bathroom. April started wanting to play with her.

Q Did she indicate how many times the incidents with Michael Burch had happened?

A No.

Q Did ... she indicate whether or not Michael had been involved in the incident in the bathroom?

A All I know is that something had happened with Linda, [R——] and Michael in the garage. And that something also happened in the bathroom with Linda. But I didn't push the questioning. I wasn't—I called on somebody else that was more experienced in that."

K—— notified the police. Officer Reginald Roberts was dispatched to K——'s residence. K—— told Roberts about R——'s disclosures. Roberts, outside K——'s presence, interviewed R——. Roberts testified he changed the subject matter to unrelated activities during the interview, coming back to the alleged child abuse three different times. He did this to be sure there were no inconsistencies in what R—— was saying and that she was not "making up" the story. According to Roberts, R—— was exact in what she said on all three occasions. Roberts' testimony:

---

4. Linda's surname is not Burch. To ensure the anonymity of Linda's daughter, April, we omit Linda's surname.

"... She said that Mike had touched her on the pee-pee, and pointed to her vagina. And—

Q —Did she tell you where that had happened?

A She told me at Mike's house. Now she described, as I recall, two incidents. One which occurred in the bathroom at Mike's house, as she put it.... The other incident she said had occurred in the garage at Mike and Linda's house....

Q And did she show you what she meant by her tee-tee?

A Yes. She ... told me that was where he had touched her using his finger. And she pointed to herself and she said that he had touched her on the poo-poo, I believe is what she used, and then pointed to the rectum on the back side.... That she on one instance to the bathroom, I believe it was that she had her clothes off, he had his clothes on. And then she made reference to that they, meaning Mike and Linda, had called her bad names....

Q Did she tell you the circumstances under which he had called her [the names]?

A She said that—I asked if he had ever hurt her. She said yes. And I asked her if she had told him to stop and she said yes. And I asked if he did and she said that he slapped her on the head and told her not to tell her mother and then called her the bad names....

On cross-examination Roberts stated R—— did not tell him April had touched R——'s tee-tee. Cross-examination continued:

"Q ... Now, did she tell you that Mike and Linda took her into the bathroom? Did she tell you that?

A She said that—yeah, that Mike— she was in the bathroom and Mike had came in there and touched her tee-tee."

Roberts accompanied K—— and R—— to a hospital where Robert L. Beaton, Jr., a medical doctor, was asked to examine R—— "for possible sexual abuse." Beaton asked R—— what had happened. Beaton's testimony:

"... I think she used the word a tee-tee hole and said that a neighbor had taken, I believe his finger and placed it in her private area and she used the word tee-tee hole and poo-poo hole, I believe.

....

Q Do you now have an independent recollection as to what she told you the name of the neighbor was?

A Right. She said Mike and Linda. And I didn't ask her specific last names.... She just said Mike and Linda.

Q And what is it she said they had done? Mike and Linda. That Mike had done?

A She said they had, that had taken their finger and placed it on, and she used the words tee-tee hole and—and poo-poo hole which when I asked her, pointed to her vagina and her anus, she confirmed it....

Q Did she indicate to you any complaints, any discomfort or physical complaints prior to your examination or as a part of that examination?

A She did complain of some burning in her, around her vagina, she did. And I believe when the nurse examined her she complained that it hurt in the private areas, so—yes.

....

Q Did you in fact conduct a gynecology exam or internal examination of [R——]?

A Yes.

Q And ... what were your findings?

A The findings were basically I found there was no blood and I found a fairly normal appearing vagina. The hymen was intact. And there were no large anal tears or other large tears that I could see under the, you know, I did not do a speculum exam on her, which is a metal speculum. We just did a visual exam.

Q Could you tell whether the hymen was open or closed in this child?

A It was, as I recall, it was a little open but it was intact. It had not been torn."

Beaton found no bruises or lacerations, and no evidence confirming or eliminating sexual abuse.

On May 29, 1986, deputy juvenile officer Marilyn Marie Gibson, in the presence of social service worker Sarah Belle King of the Missouri Division of Family Services and a detective from the Springfield police department interviewed R—— at Gibson's office. Gibson explained: "It is customary to have the family services worker present during the interview, and also the police, because it is a criminal investigation. We try to have everyone present at the same time in the interview so the child does [not] have to tell the story numerous times." Gibson's testimony continued:

"She started talking about April and Michael and Linda. And I asked what had happened and she said that they had been touching her.... And she basically said that there were a couple of incidents that happened that one of them had occurred in a bathroom with Michael and Linda and April where there had been some oral sex. April had placed her mouth on the vaginal area of [R——]. And she told me about an incident where there's a garage ... where April played a lot.... And [R——] was allowed to go down and play with her.... And when she would go down and play she said Mike and Linda would come out and play with them and they would do more of the sexual things where Michael would put his finger between his [her ?] legs. And had also done some oral sex, placed his mouth in her vaginal area.... She said that he used his finger ... what we usually try to do ... [is] to do a verbal interview with the child first and then attempt to use the dolls to have them show us how it happened.

Q   You say the dolls; what kind of dolls are you talking about?

A   We have anatomically correct dolls which have all the parts.... they look as accurate so the child can identify and recognize the parts. But before we started that, what we did is we were sitting on the floor and she spread her legs and used her hand and took her finger and was showing me where he put

it. Now she did not touch herself as she did she pointed and used—the finger like this.

Q   And where did she point to?

A   Her vaginal area between her legs.

Q   Did you then use the anatomically correct dolls with [R——]?

A   Yes, I did."

Gibson testified she had R—— remove the dolls' clothing to see whether R—— knew the parts of the body. Gibson then had R—— put the clothes back on the dolls to avoid any suggestion that the clothes were off during any incident R—— might demonstrate. Gibson then had R—— name the dolls. Gibson's testimony continued:

"... [S]he took the clothes—pulled down the pants of the [R——] doll and had the April doll, she put the face of the April doll in between the legs of the [R——] doll. And then she took the Michael doll ... showing us how he used the finger to put in the vaginal area of the [R——] doll ... she took—these dolls are just like rag dolls and they have fingers ... and you can move them, and she took the middle finger of one of the dolls, which was the Michael doll, and put it into the [R——] doll—or started to put it in and she said: no, no, wait a minute, that's the wrong hand. And she switched hands and got a different hand on the Michael doll and again picked out the one finger and put it in the hole ... of the [R——] doll.

Q   Did she put it inside?

A   She put it up to it as much as you can get it inside. You couldn't have put it inside the way the dolls are made. But she put it up to it and she made a motion like this. And then she made like a scratching motion with it and showed both ways that it was done.

. . . .

Q   Did this child have a definite concept of distinct events? Was she able to separate one event from another?

A   She was able to tell me about two distinct events. One of which happened in the bathroom. And that involved all four. And that involved with April doing

stuff to her. And April is also five-years-old, she's several months ... younger than [R——]. And she also said that Michael had done some things in there. Now, the other event she told me was definitely in the garage. And these events did not vary when she was showing me with the dolls or when she was giving me a verbal report. It was in the bathroom with all four; it was in the garage with all four."

Asked on cross-examination what she (Gibson) had taken into account in determining whether R—— had been sexually molested, Gibson listed several factors. Her testimony:

"One of the things is that any time I interview a child at the age of five, we look to see if they have knowledge of sexual matters way beyond what they should know. And when you start talking about oral sex, digital, or what they call using your finger in the vaginal area, and being able to tell that story, it is real significant.... [O]ne of the ways that we can spot whether a child is telling the truth or whether someone has told them to tell a story, you can look and see what they say. Okay. And if—when we get to the dolls and they start to play with the dolls, if they cannot tell that story and do it with the dolls and have the proper—I don't know how to explain it. The expression on their faces they need, then you can bet that someone has told them what to say. Because a child that young cannot act out and tell the story if it's not true. And then I also look at the expression on their face while they're doing it, the spontaneity of telling the story. And when she was telling me ... that Mike had told her not to tell and she said he said he'd slap me in the head— and she slapped herself on the head—for doing it. Those are things which tend to make me believe that no one sat down and told that child what to say because she cannot at her age act it out."

Social service worker King testified she made notes while deputy juvenile officer Gibson was interviewing R—— on May 29, 1986. Using the notes, King prepared a summary of R——'s disclosures during the interview. King's testimony:

"Q ... what if anything did [R——] tell you had occurred?

A [R——] told us about two different specific incidents. The first incident that [R——] described that she said occurred in the bathroom at the house ... [w]here April ... resides.... She stated that April ... and Linda ... and Mr. Michael Burch ... and herself, [R——], went into the bathroom. [R——] stated that they all took their clothes off. [R——] stated ... that April touched [R——'s] tee-tee as she referred to her vaginal area.... [R——] also stated that Michael Burch put his finger in her tee-tee. [R——] then stated that Michael Burch put his mouth on her tee-tee. [R——] then described a second incident ... as having occurred in a garage where ... she had played with April and her toys. And [R——] stated in the garage, that April had asked [R——] to put her mouth on April's tee-tee but that she did not. And she stated that she had been told not to tell anyone.

. . . .

Q Did she indicate whether or not Michael Burch had ever used any kind of force on her in connection with these incidents?

A [R——] had stated that she had been hurt but she did not specifically describe that, as I recall, as having anyone using any great force with her.... I do recall that she showed us and demonstrated by using her own hand with the palm down that she was hit by various family members on the top of her head.

Q Specifically had she mentioned Michael Burch in that connection?

A Yes, she did.

Q Had she demonstrated to you on the dolls what Michael Burch had done?

A Yes, she did. I considered that the most significant of the entire interview.

Q Why is that?

A Her spontaneous behavior. She showed with the doll which was used to represent Michael Burch, and the doll that was used to represent herself,

[R——]. She showed the [R——] doll lying on the back and the Michael Burch doll with placing one individual finger inside the [R——] doll. And when she did this, she first started to use one hand on the Michael Burch doll and then she changed it and said no, it was the other hand. That's a very spontaneous behavior and one of the things we look for in trying to determine if a child in any way has been coached or rehearsed."

Upon completion of the interview at Gibson's office, Gibson asked K—— to take R—— to a gynecologist to see if there was "any physical confirmation of the story."

K—— took R—— to Rufus Steven Grace, an obstetrician and gynecologist, the following day (May 30, 1986). Grace's testimony:

"Q ... can you tell us specifically what kinds of examinations you conducted and what the result of those examinations were?

A Well, did a visual exam of [R——] including her perineal area which is the vulva the external genitalia....

Q Did you find anything unusual in that?

A Well, the findings at the time she had a small superficial laceration by the labia minora which is the internal lips on the vulva on the left side by the clitoral area extending down toward the vaginal introitus.... And then she also had a small abrasion or what appeared to be a bruise on the hymenal ring at about six o'clock posteriorly.

. . . .

Q Were you able to visualize the hymen on [R——]?

A Yes.

Q And was ... the hymen open or closed?

A Well, the hymen was open. In that there was an opening into the vagina. As I said there was the one small bruise on the hymenal ring, which is the ring of tissue around the vagina.

. . . .

Q Could you tell how recent the laceration was to the child's vagina?

A No, I didn't have any way to document the exact time of when that would have occurred.... it was a laceration or a scratch that hadn't healed. Normally in that area I would assume that something would, with normal healing time, should be within a week or ten days. But I don't have any, with my knowledge, any way of documenting any time closer.

Q Okay. Is it possible that the lacerations could have existed several days before and not have been picked up in a routine emergency room examination?

A Oh, I would say it's possible. I don't, you know, it's certainly—things are missed in exams. How long it was there, you know, again I can't tell you."

On cross-examination Grace stated normally a bruise like he found on R—— would heal within two to three weeks and he could not provide a more accurate determination of its age. The laceration, said Grace, could have been caused by the insertion of a finger into R——'s vagina.

At time of trial R—— was six years and four months of age, and was in the first grade. Inasmuch as she was alleged to be a victim of an offense under chapter 566, she was a competent witness and could testify without qualification. § 491.060(2); *State v. Williams*, 729 S.W.2d 197 (Mo. banc 1987), *cert. denied*, 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987).

R—— identified defendant in open court and, upon being shown a doll, named certain body parts including its "tee-tee." When asked whether anyone had ever touched her there, R—— shook her head but said nothing. Further questioning resulted in head shakes but no verbal responses. With defendant's acquiescence, a lady characterized as the "victim's witness assistance person" at the prosecutor's office, with whom R—— had become acquainted, was permitted to sit beside R—— while she testified.

R—— testified that while she was at April's house, Mike and Linda touched her tee-tee. Her testimony:

"Q How did he touch your tee-tee?

A With his finger.

Q  Did he put his finger outside your tee-tee or did he put it inside?

A  Inside.

. . . .

Q  Did Mike touch you with anything besides his finger?

A  Just his finger.

Q  Okay.  Who was there when Mike touched you?

A  Linda.

Q  Was anybody there besides Linda?

A  April.

Q  Did April or Linda touch you with—on your tee-tee?  Who did it?

A  April and Linda.

. . . .

Q  Where were you when they did that?

A  April did it to me in the bathroom and then Mike and—did to me in the garage.

. . . .

Q  Did you have your clothes on, [R——], when that happened?

A  (Shakes head) And they took them off.

Q  Who took them off?

A  Linda and Mike and April.

. . . .

Q  Did they all take off their clothes or just you?

A  Just me.

. . . .

Q  Did he tell you to tell your mama or not to tell your mama or anything like that?

A  Not to tell.

. . . .

Q  Did you tell anybody what happened?

A  I hollered at my mommy real loud.

. . . .

Q  Did you ever tell your mama what Mike did?

A  (Nods head)

. . . .

Q  What were you doing when you told your mama?

A  I ran into my house and told her."

The prosecutor asked R—— to use a "boy dolly" and a "girl dolly" and show the jury what defendant did.  R——'s testimony continued:

"Q  . . . Did you have your panties on or were your panties off?

A  Off.

Q  Who took them off?

A  Mike.

Q  . . . Did Mike have his pants on or were his pants off?

A  On.

Q  Okay.  [R——], did it happen any other place besides in the garage?

A  In the bathroom.

Q  And who was in the bathroom with you?

A  April.

Q  Was anybody there besides April?

A  Linda and Mike.

. . . .

Q  Were they in the bathroom, too, with you and April?

A  Just in the garage.

Q  Okay.  So in the bathroom it was just April?

A  (Nods head)"

On cross-examination R—— testified Linda touched R——'s tee-tee in the garage, that defendant was present when this occurred, and that April touched R——'s tee-tee in the bathroom but not in the garage. R—— testified Linda touched R——'s tee-tee only once.  R—— was then directed to an occasion when she testified "last year in court" (evidently the preliminary hearing):

"Q  And do you remember you said in court she did twice?  Do you remember that?

A  Um-hum." [5]

---

**5.**  In his brief defendant maintains R—— testified at the preliminary hearing that he touched her three times, in contrast to her trial testimony that he touched her only once.  We have studied the transcript reference cited by defendant in support of that assertion.  The transcript shows R—— was asked on cross-examination whether, during testimony "last year in court," she had said defendant touched her tee-tee three times. Her response was: "(Shakes head)."  This description appears to characterize a head movement from side to side, indicating a negative

Further cross-examination of R— produced this dialogue:

"Q ... Now, you do remember saying that Michael had touched you three times the last time you testified, don't you?

A No, he touched me just two times.

Q Two times? Okay. And do you remember the last time you were here you said three times?

A Huh?

Q Do you remember one time you said he touched you three times? Do you remember that?

A Just one time and two times.

. . . .

Q Was one time in the garage and one time in the bathroom?

A One time in the bathroom and two times was in the garage."

Defendant's evidence included his own testimony that he never molested R—, along with other evidence that need not be summarized. At the conclusion of all the evidence, defendant moved for a judgment of acquittal. The motion was denied.

The first point in defendant's excellent brief [6] is:

"The trial court erred in overruling [defendant's] motion for judgment of acquittal at the close of all the evidence and in submitting the case to the jury on the charge of sodomy, because the evidence was not sufficiently substantial to support [the] conviction in that [R—], the only witness to the alleged act, gave testimony at trial that was highly contradictory when viewed against numerous statements previously made by the witness and accordingly required corroboration which must also be substantial evidence and the only such corroborating evidence was the testimony of two doctors, Drs. Grace and Beaton, that examined [R—], whose findings, by their own admission, were inconclusive."

■ The testimony of a prosecutrix is alone sufficient to sustain a sodomy conviction without other corroboration unless her testimony is so contradictory or in conflict with physical facts, surrounding circumstances, and common experience as to be unconvincing. *State v. Smith*, 679 S.W.2d 899, 902[7] (Mo.App.1984); *State v. Sipes*, 651 S.W.2d 659, 660[1] (Mo.App.1983); *State v. Johnson*, 595 S.W.2d 774, 776[1] (Mo.App.1980). It is only in those cases where the evidence of the prosecutrix is of a contradictory nature or, when applied to the admitted facts in the case, her testimony is not convincing and leaves the mind of the court clouded with doubts, that she must be corroborated or a conviction cannot be sustained. *State v. Ellis*, 710 S.W.2d 378, 380 (Mo.App.1986). The latter rule does not appertain, however, where the inconsistency or even contradiction bears on a proof not essential to the case. *Id.; State v. Salkil*, 659 S.W.2d 330, 332–33[3] (Mo.App.1983); *Johnson*, 595 S.W.2d at 776[3].

In *State v. Kuzma*, 751 S.W.2d 54, 58[4] (Mo.App.1988), the Western District of this Court stated that although some debate exists as to what inconsistent statements can be considered in determining whether the prosecutrix's testimony must be corroborated, "a reading of Missouri cases in point reveals that courts have based that determination on inconsistent statements made at trial, at a deposition, out of court to a third party, and various combinations of those sources."

■ In the instant case defendant argues that inconsistencies permeate R—'s testimony (a) at trial, (b) at the preliminary hearing, and (c) extrajudicially.

As to the inconsistencies at trial, defendant points out that R— testified about two incidents, one in the bathroom and one in the garage. Regarding the bathroom incident, R— first testified April touched R—'s tee-tee in the presence of Mike and Linda. Later R— testified Mike and Linda were present only in the garage. Still later, says defendant, R— testified defendant put his finger in her tee-tee in the bathroom.

response, instead of a nodding upward and down, indicating an affirmative response.

6. The lawyer who authored defendant's brief is not the lawyer who represented him at trial.

As to conflicts between R——'s extrajudicial statements and her trial testimony, defendant asserts Officer Roberts testified R—— told him that defendant touched her tee-tee and her anal area, and that this occurred on two occasions, once in the bathroom and once in the garage. Defendant points out that social service worker King testified that during the interview at deputy juvenile officer Gibson's office three days after R——'s disclosures to Roberts, R—— testified that April, Linda and defendant were all involved in the bathroom incident. King's testimony, quoted earlier, was that in the bathroom (according to R——) April touched R——'s tee-tee, that defendant put his finger in R——'s tee-tee, and that defendant put his mouth there.[7]

Defendant also refers us to Gibson's testimony wherein Gibson quoted R—— as saying April placed her mouth on R——'s vaginal area in the bathroom, and to King's testimony wherein King recalled R—— saying April had asked R—— to put her mouth on April's tee-tee in the garage. It is obvious, of course, that there could not possibly have been a conflict between what R—— told Gibson and what R—— told King, as R——'s narrative was presented to both officials at the same time. To the extent that there is a difference between Gibson's testimony about R——'s disclosures and King's testimony about R——'s disclosures, the conflict is between the testimony of the two adults. If defendant's point is that R——'s trial testimony made no reference to oral sex with April, we find no inquiry about the subject during R——'s direct examination or cross-examination.

Defendant reminds us that R—— testified she "hollered at my mommy real loud" and ran home and told her mother what defendant did. That is contrary to K——'s testimony that R—— first reported the incidents upon returning from Texas May 26, 1986.

As they had been gone six days, the incidents had to have occurred on or before May 20, 1986.

Finally, defendant directs us to the following testimony which, so he says, demonstrates contradictions in R——'s extrajudicial statements. Officer Roberts testified that upon arriving at K——'s residence May 26, 1986, he was told by K—— that when she questioned R—— about rubbing her vaginal area, R—— said, "Mike and Linda had done it." On direct examination at trial, K—— quoted R—— as saying: "... Linda and Mike do. And April does." On cross-examination at trial, K—— conceded that during the preliminary hearing she had testified that upon asking R—— about her hand being beneath her skirt, R—— had said, "Linda does." Obviously the conflicts mentioned in this paragraph are between K——'s three versions of what R—— reported to K—— on May 26, 1986. There is no showing that R—— herself, in telling K—— about the incidents, made any conflicting statements.

In sum, while there are admittedly conflicts in R——'s accounts of who was present in the bathroom and the acts that occurred there, and also in R——'s accounts of who was present in the garage and the acts that occurred there, R—— was consistent in maintaining, extrajudicially and in court, that in the garage defendant inserted his finger into her genital orifice. She demonstrated this with the dolls at deputy juvenile officer Gibson's office May 29, 1986, spontaneously remarking that she had initially taken the wrong hand of the Michael doll in recreating the incident. Whether defendant also committed a crime against R—— in the bathroom, or whether Linda committed crimes against R—— in the bathroom or in the garage,[8] is immaterial to the issue of whether defendant committed sodomy on R—— in the garage. We are mindful that R——'s testimony that she

---

7. Defendant maintains that according to King's testimony, possibly another child was involved in the bathroom incident. We do not read King's testimony that way. While the term "another child" appears in King's testimony about the bathroom incident, it is apparent to us that King was using the term to describe April.

8. At trial, defendant testified Linda was also charged with "this offense," that Linda has a "mental condition," and that Linda was then residing at Nevada State Hospital. April was "in a foster home somewhere."

ran home and told K—— what defendant had done is at odds with K——'s testimony that R—— first reported defendant's actions May 26, 1986, upon returning from Texas. That conflict, however, does not bear on proof of an element of the crime charged against defendant. As none of the contradictions in R——'s accounts of the incidents in the bathroom and the garage undermined R——'s trial testimony that defendant committed sodomy on her in the garage, we hold corroboration of R——'s testimony is not required to sustain the conviction.[9]

■ There was, nonetheless, other evidence that the crime had occurred. K—— was asked whether she observed any changes in R——'s behavior after R——'s disclosures of May 26, 1986. K——'s testimony:

"She was kind of snappy and just irritable like she had a problem, and bed wetting started. Pretty heavy for a while and not wanting to sleep alone. Just scared of being by herself.

Q Did she have any nightmares or anything unusual she had not had before?

A She'd wake up in the middle of the night and she'd be crying and she'd just —she'd wake me up by coming in and crawling into bed with me, crying and saying she was scared."

Deputy juvenile officer Gibson made reference to R——'s bed wetting and nightmares, and testified without objection that behavior changes are one of the indicators of sexual abuse.

In *State v. Pollard*, 719 S.W.2d 38 (Mo. App.1986), the accused was convicted of sodomizing a child. On appeal he assigned error in the admission of evidence that for two weeks after the alleged crime there were changes in the victim's behavior in that the victim was afraid to go to school, suffered from loss of appetite, and had

nightmares. The Eastern District of this Court, citing *State v. Ogle*, 668 S.W.2d 138 (Mo.App.1984), *cert. denied*, 469 U.S. 845, 105 S.Ct. 154, 83 L.Ed.2d 91 (1984), held that the evidence of the victim's behavioral changes was some evidence that the act complained of had occurred. *Pollard*, 719 S.W.2d at 40[2]. In *State v. Burke*, 719 S.W.2d 887 (Mo.App.1986), the accused was convicted of sodomizing a 12–year–old girl. The trial court permitted the victim's mother to testify that the victim, immediately after the date of the alleged incident, did not want to return to school, her grades began to drop, she started having nightmares, and she would not go outside alone. The accused argued on appeal that the admission of this evidence was error. Rejecting the contention, the Eastern District of this Court held that common experience teaches that a sexual offense can cause behavioral and personality changes in the victim, and that evidence of such changes renders the occurrence of the offense more probable than it would be without such evidence. *Id.* at 890.

Besides R——'s behavioral changes there was Dr. Grace's testimony that upon examining R—— May 30, 1986, he found a superficial laceration by the labia minora and a small bruise on the hymenal ring. While Grace was unable to determine how recently the injuries had occurred, he opined that the normal healing time of the laceration should be a week to ten days, and the bruise would heal within two to three weeks. Grace testified the laceration could have been caused by insertion of a finger into R——'s vagina.

Given the healing periods of the two injuries, the jury could have reasonably believed they were inflicted a day or two before the six-day Texas trip, which apparently began May 21, 1986.[10]

9. The State's evidence did not identify the date defendant committed sodomy on R—— in the garage. K—— testified, however, that she and her children had resided near defendant only about four months when R—— reported the incident. Defendant raises no issue about the lack of proof of the date the offense occurred.

10. K—— testified the first day of the trip was spent traveling, the next four days were spent in Texas, and the sixth day was spent traveling back.

Defendant argues that inasmuch as Dr. Beaton found neither of the injuries detected by Dr. Grace, it is improbable that the injuries occurred prior to the Texas trip. Beaton testified, however, that if the laceration was superficial he might have missed it, and he could not necessarily conclude that the injuries found by Grace had occurred after his (Beaton's) examination.

In determining the sufficiency of the evidence to support the verdict we consider the evidence and all inferences reasonably to be drawn therefrom in the light most favorable to the verdict, and disregard all contrary evidence and inferences. *State v. Guinan*, 665 S.W.2d 325, 327 (Mo. banc 1984), *cert. denied*, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *State v. McDonald*, 661 S.W.2d 497, 500[1] (Mo. banc 1983), *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1875, 85 L.Ed.2d 168 (1985). The test is whether the evidence, so viewed, was sufficient to make a submissible case from which rational jurors could have found beyond a reasonable doubt that defendant was guilty. *State v. Bonuchi*, 636 S.W.2d 338, 340 (Mo. banc 1982), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 446 (1983); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–92, 61 L.Ed.2d 560, 576–77 (1979). Measured by this standard the evidence was sufficient to support the conviction. Defendant's first point is denied.

His second point is:

"The trial court plainly erred in allowing [K——], Reginald Roberts, Marilyn Gibson, and Sarah King to testify regarding ... [R——'s] extrajudicial statements about the alleged acts of sodomy and who had committed them pursuant to [§] 491.075 because this testimony constituted improper bolstering in that [R——] testified to these issues, the four witnesses' testimony was duplicative and corroborative, covering the same precise ground as [R——'s] testimony, and [defendant] totally denied the charge of sodomy creating sharply contested fact issues. Further, even though [R——] may have been impeached with prior inconsistent statements on these issues the testimony was not limited to that necessary to rehabilitate the witness as evidenced by the following: [K——] testified before [R——]; the three other witnesses testified about what the complaining witness had told them with regard to the alleged act of sodomy; and Gibson and King testified about the exact same statements made during an interview Gibson conducted with [R——]. Given the absence of independent corroboration, the improper bolstering of [R——'s] extrajudicial statements constituted a manifest injustice and prejudice to [defendant]."

Defendant concedes that the lawyer who represented him at trial failed to assert the "improper bolstering" objection when the four witnesses named in the second point testified, consequently the point is before us for only plain error review. Under that standard, relief will be granted only when the error so substantially affects the rights of an accused that a manifest injustice or miscarriage of justice will inexorably result if left uncorrected. *State v. Sidebottom*, 753 S.W.2d 915, 919–20[3] (Mo. banc 1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 515, 102 L.Ed.2d 550 (1988).

Section 491.075, referred to in defendant's second point, provides:

"1. A statement made by a child under the age of twelve relating to an offense under chapter ... 566 ..., RSMo, performed with or on a child by another, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings in the courts of this state as substantive evidence to prove the truth of the matter asserted if:

(1) The court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2) The child either:

(a) Testifies at the proceedings; or
...."

In the instant case the trial court conducted a hearing outside the presence of the jury prior to the testimony of each of the four witnesses named in defendant's

second point, and found sufficient indicia of reliability in each instance. Defendant assigns no error regarding those determinations.

Defendant's complaint of error is based on *State v. Seever*, 733 S.W.2d 438 (Mo. banc 1987), a prosecution for sexual abuse of an eight-year-old girl. The prosecutor presented at trial a videotaped statement by the victim per § 492.304 in which she described incidents demonstrating the accused's guilt of the offense charged. After the videotape was viewed by the jury and other testimony was heard, the prosecutor called the victim as a witness, and her testimony covered the same precise ground as the videotape. The Supreme Court of Missouri held that such procedure resulted in an improper enhancement and rehabilitation of the victim's testimony. 733 S.W.2d at 441[2].

Ten months after *Seever* the Supreme Court of Missouri decided *State v. Wright*, 751 S.W.2d 48 (Mo. banc 1988). There the accused was convicted by jury of raping and sodomizing a six-year-old girl. At trial the victim gave testimony which, if believed, was sufficient to support the charges. The prosecutor, relying on § 491.075, presented, over the accused's objection, testimony by a police detective regarding extrajudicial statements made by the victim to the detective shortly after the alleged crimes occurred. On appeal the accused maintained § 491.075 was unconstitutional. The Supreme Court of Missouri upheld the statute as applied in that case, noting that the victim testified at trial and was subjected to cross-examination. 751 S.W.2d at 52. The accused also asserted he was denied due process because the detective's testimony improperly bolstered the victim's testimony, citing *Seever*. The opinion in *Wright*, emphasizing that no improper bolstering objection was made at trial, gave the point plain error review only. The opinion said:

> "Unlike the evidence in *Seever*, [the detective's] testimony was not totally duplicative of the victim's testimony at trial, and as noted previously, out-of-court statements such as those in question are a species of evidence distinct from the declarant's testimony at trial possessing

unique strengths and weaknesses. Further, the procedure followed here did not vary from the procedure utilized when other hearsay exceptions, such as 'excited utterances,' are involved. We find no plain error in admitting [the detective's] testimony." 751 S.W.2d at 53[8].

In the instant case K——'s testimony regarding R——'s disclosures contained few details, hence it cannot be characterized as duplicative of R——'s testimony.

Officer Roberts' testimony regarding R——'s statements included two events unmentioned in R——'s testimony: defendant's touching of R——'s anal area and defendant's slapping of R——'s head and calling her bad names. Furthermore, R——, during her testimony, said April had touched R——'s tee-tee; no mention of that appears in Roberts' testimony. In the above respects Roberts' testimony was not duplicative of R——'s testimony.

Gibson and King were, of course, two separate witnesses, but the statements of R—— about which they testified were made by R—— on one occasion, not two separate occasions. Gibson's testimony regarding R——'s statements included R——'s descriptions of acts unmentioned by R—— at trial—April placing her mouth on R——'s vaginal area and defendant doing the same thing. King's testimony pertained to Gibson's interview with R——, not a different interview, thus there was no creation of evidence by having R—— tell her story anew to King, then having King repeat R——'s story to the jury.

These circumstances clearly differentiate the instant case from *Seever* where the victim in effect testified twice, once in person and once by videotape. As demonstrated above, there were numerous instances where the testimony of K——, Roberts, Gibson and King did not duplicate R——'s testimony. Applying *Wright*, we hold that no manifest injustice or miscarriage of justice resulted from the testimony complained of in defendant's second point. It is consequently denied.

■ Having rejected both of defendant's assignments of error in appeal number 15233, we turn now to appeal number 15982. Defendant's lone assignment of er-

ror there is that the trial court erred in denying relief without an evidentiary hearing, as defendant received ineffective assistance of counsel at trial in that his lawyer failed to investigate four "potential exculpatory witnesses" who would have testified "to the irregularity of the garage doors being closed." Such testimony, says defendant, "would have cast doubt on whether or not the incident actually occurred." Defendant maintains he was entitled to an evidentiary hearing on this allegation.

We dispose of the point on procedural grounds.

As reported at the outset of this opinion, defendant commenced the post-conviction action in the trial court June 13, 1988. He did so by filing a verified pro se motion. The next day (June 14, 1988) the trial court found defendant indigent and appointed the public defender to represent him. The prosecutor subsequently filed a motion to dismiss defendant's action without an evidentiary hearing, and served notice on the public defender that the motion to dismiss would be heard July 22, 1988. The trial court's docket sheet shows that on July 22, 1988, an "oral motion" by defendant to continue the hearing on the prosecutor's motion to dismiss was sustained "until August 19, 1988, ... to allow [defendant] time to file amended motion to vacate by the time of hearing."

On August 19, 1988, defendant filed an unverified amended motion for relief under Rule 29.15, accompanied by a motion to extend the deadline for filing a verified amended motion until September 19, 1988.

A verified amended motion for relief under Rule 29.15 was filed by defendant August 30, 1988. The record on appeal contains no order by the trial court purporting to extend the deadline for filing the verified amended motion beyond August 19, 1988. The trial court's findings of fact, conclusions of law, and order did, however, address the allegations of the verified amended motion, consequently it could be argued that the trial court by implication undertook to extend the deadline for filing the verified amended motion to August 30, 1988.

Rule 29.15(f) provides, however, that any amended motion under Rule 29.15 shall be verified by the movant and shall be filed within 30 days of the date counsel is appointed for him. Rule 29.15(f) authorizes the trial court to extend the time for filing the amended motion for one additional period not to exceed 30 days.

In *Day v. State*, 770 S.W.2d 692 (Mo. banc 1989), a prisoner (Barnes) filed a pro se motion for post-conviction relief under Rule 29.15 on February 9, 1988. On February 24, 1988, the court appointed counsel. On April 29, 1988, counsel tendered an unverified amended motion and a request to file it out of time. The court, per Rule 29.15(f), refused permission to file the amended motion, and dismissed the pro se motion for failure to state a cause of action. 770 S.W.2d at 695. On appeal the Supreme Court of Missouri held that the time limitations in Rule 29.15 are valid and mandatory, 770 S.W.2d at 695[1], and that under Rule 29.15(f) Barnes had a maximum of 60 days from the date counsel was appointed to file an amended motion, which had to be verified. 770 S.W.2d at 696. The circuit court's ruling was upheld.

We are convinced that in *Day* the Supreme Court of Missouri has clearly held that the time limitation in Rule 29.15(f) for filing an amended motion cannot be extended beyond the period specified there. To hold otherwise would emasculate Rule 29.15(f). Hence any order, implicit or otherwise, by the trial court in the instant case purporting to extend the deadline for filing defendant's amended motion beyond 60 days from the date the public defender was appointed to represent him would have been without legal efficacy.

Inasmuch as the public defender was appointed to represent defendant June 14, 1988, the last day upon which an amended motion could have been filed would have been Monday, August 15, 1988. Rule 44.01(a), Missouri Rules of Civil Procedure (19th ed. 1988); Rule 29.15(a). Defendant's only motion for post-conviction relief on file as of that date was his verified pro se motion. Neither the unverified amended motion nor the verified version of the amended motion was filed by August 15, 1988. Defendant's failure to file the

amended motion to vacate within the time specified by Rule 29.15(f) constituted a waiver of all grounds for relief asserted in such motion. *Day,* 770 S.W.2d at 696[2].

Defendant's assignment of error on appeal is based on an averment in his unverified amended motion filed August 19, 1988, and his verified amended motion filed August 30, 1988. Defendant's pro se motion contains no complaint about his lawyer's failure to investigate the alleged four potential exculpatory witnesses.

As the ground for relief asserted in defendant's point on appeal was never presented to the trial court by a timely verified motion, such ground could not have supplied a basis for relief and the trial court obviously cannot be convicted of error in rejecting such ground without an evidentiary hearing.

The judgment declaring defendant guilty of sodomy and sentencing him to seven years' imprisonment is affirmed; the order of the trial court denying relief in the Rule 29.15 proceeding is affirmed.

HOLSTEIN, C.J., and GREENE, J., concur.